**Diane JETER, Plaintiff-Appellant,**

v.

**CREDIT BUREAU, INC.,
Defendant-Appellee.**

**No. 84–8009.**

United States Court of Appeals,
Eleventh Circuit.

May 20, 1985.

Ralph Goldberg, Atlanta, Ga., for plaintiff-appellant.

W. Rhett Tanner, Caryn R. May, Atlanta, Ga., for defendant-appellee.

Before KRAVITCH and ANDERSON, Circuit Judges, and ATKINS*, District Judge.

ON PETITION FOR REHEARING

(Opinion March 4, 1985, 11 Cir., 1985, 754 F.2d 907).

R. LANIER ANDERSON, III, Circuit Judge:

No member of this panel nor other Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc (Rule 35, Fed.R.App.P.; Eleventh Circuit Rule 26), the Suggestion for Rehearing En Banc is DENIED.

---

* Honorable C. Clyde Atkins, U.S. District Judge for the Southern District of Florida, sitting by designation.

The Petition for Panel Rehearing, having pointed out a factual error in the opinion (which does not, however, change our result or rationale), is GRANTED; our previous opinion is, thus, withdrawn, and the following opinion is substituted:

Appellant Jeter appeals the district court's grant of summary judgment in favor of appellee Credit Bureau, Inc. ("Credit Bureau"), in Jeter's suit under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C.A. § 1692. 584 F.Supp. 973. With regard to Jeter's claims under 15 U.S.C.A. § 1692e ("False or misleading representations"), we hold that the district court applied an improper legal standard and erred in granting summary judgment to Credit Bureau. We agree with the district court's grant of summary judgment in favor of Credit Bureau with regard to Jeter's claim under 15 U.S.C.A. § 1692d ("Harassment or abuse"). Thus, we affirm in part, reverse in part, and remand for proceedings not inconsistent with this opinion.

## I. FACTS AND PROCEDURAL BACKGROUND

Credit Bureau operates a debt collection agency subject to the FDCPA. Credit Bureau attempts to collect money on behalf of creditors who refer accounts (*i.e.*, alleged debts) to Credit Bureau for collection. One of Credit Bureau's clients during the time period preceding this lawsuit was Associated Consumers Club ("Associated Consumers"). Sometime prior to October 25, 1983, Jeter incurred what Associated Consumers believed was a valid legal debt with Associated Consumers. On October 25, 1983, Jeter's account was referred by Associated Consumers to Credit Bureau for collection. On March 4, 1983, Credit Bureau sent Jeter a letter which reads as follows:

Take notice that the above creditor claims you are indebted to him as shown.

Although duly demanded, the same has not been paid. You have ignored our previous contacts.

Therefore, you are hereby notified that unless satisfactory arrangements are made within five (5) days from this date, we will recommend to our client, suit and subsequent action (judgment, garnishment, levy, and/or attachment proceedings) may be instigated against you by their attorneys.

Respond now and avoid the necessity of further action. An envelope has been enclosed for your convenience.

After March 4, and prior to April 7, 1983, neither Credit Bureau nor Associated Consumers took any further action with regard to Jeter's account. Jeter did not respond to the letter during this time period. On April 7, 1983, Credit Bureau sent Jeter another letter which reads as follows:

This is our final notice to you before recommending that our client give the account to their attorney for legal action.

Although it may cause you embarrassment, inconvenience and further expense, we will do so if the entire balance is not in this office within the next five days.

To insure proper credit, please return this notice with your payment in the envelope enclosed.

Attend to it now—This is a final notice.

Neither Credit Bureau nor Associated Consumers took any action with regard to Jeter's account subsequent to the April 7, 1983, letter.

Sometime prior to May 11, 1983, Jeter hired a lawyer, Elizabeth Leonard. On May 11, 1983, Ms. Leonard sent a letter on Jeter's behalf to Credit Bureau stating Jeter's position that she owed no money to Associated Consumers. A copy of the letter was sent to Associated Consumers. Thereafter, Credit Bureau determined that the collection of Jeter's account was impractical, closed its files, and made no further contact with Jeter.

On June 16, 1983, Jeter sued Credit Bureau in the federal district court for the Northern District of Georgia claiming violations of the FDCPA.[1] First, Jeter

---

**1.** It is undisputed that Credit Bureau is a "debt collector" within the meaning of the FDCPA, *see*

15 U.S.C.A. § 1692a(6), and that Credit Bureau's activities are thus regulated by the FDCPA. It is

claimed that as a consequence of Credit Bureau's letters and its subsequent inaction, Credit Bureau had violated 15 U.S.C.A. § 1692e(5) for "threat[ening] to take any action that cannot legally be taken or that is not intended to be taken" and § 1692e(10) for using "any false representation or deceptive means to. collect or attempt to collect any debt ...." Second, Jeter claimed that Credit Bureau had "engage[d] in ... conduct the natural consequence of which [was] to harass, oppress, or abuse any person in connection with the collection of a debt" in violation of 15 U.S.C.A. § 1692d.

After limited discovery,[2] the district court, responding to Credit Bureau's motion for summary judgment and Jeter's motion for partial summary judgment, granted summary judgment to Credit Bureau on all issues. This appeal ensued.

In Part II, we discuss the legal standard applicable generally to claims of false, deceptive, or misleading representations under 15 U.S.C.A. § 1692e. In Part III.A., we consider Jeter's claims under § 1692e(5), and reverse the district court's grant of summary judgment in favor of Credit Bureau. In Part III.B., we consider Jeter's § 1692e(10) claim, apply the standard enunciated in Part II, and reverse the district court's grant of summary judgment in favor of Credit Bureau. Finally, in Part IV, we consider Jeter's claim of harassment or abuse under § 1692d, apply the legal standard developed in Part II as modified for the purpose of evaluating claims of harassment or abuse, and affirm the district court's grant of summary judgment on this issue.

## II. APPLICABLE LEGAL STANDARD

■ The district court held that in determining whether the FDCPA has been violated the court was obligated to "decide whether a 'reasonable consumer' would be deceived, mislead [sic], or harassed by the letters at issue in this case." Relevant administrative adjudications and case law under the Federal Trade Commission Act ("FTC Act"), 15 U.S.C.A. § 41, et seq., upon which we rely by analogy, and persuasive authority under the FDCPA lead us to the conclusion that the district court applied an improper standard.

Section 5 of the FTC Act declares unlawful all "unfair or deceptive acts or practices in commerce." 15 U.S.C.A. § 45(a)(1). An act or practice is deceptive or unfair under § 5 if it has the tendency or capacity to deceive. The FTC Act was enacted to protect unsophisticated consumers, not only "reasonable consumers" who could otherwise protect themselves in the market place. The leading case of *Charles of the Ritz Distributors Corp. v. FTC,* 143 F.2d 676 (2d Cir.1944), is instructive. In *Charles of the Ritz,* the petitioner was charged by the FTC with falsely advertising its cosmetic preparation "Charles of the Ritz Rejuvenescence Cream" because the name "rejuvenescence" and the accompanying advertisement "represent[ed], directly or by inference, that [the] cosmetic preparation [would] rejuvenate the skin of the user thereof or restore youth or the appearance of youth to the skin of the user." *Id.* at 678. In affirming the FTC's finding of deception, the Second Circuit defined "capacity to deceive" as follows:

There is no merit to petitioner's argument that, since no straight-thinking person could believe that its cream would actually rejuvenate, there could be no deception. Such a view results from a grave misconception of the purposes of the Federal Trade Commission Act. That law was not "made for the protection of experts, but for the public—that vast multitude which includes the igno-

---

also undisputed that the "debt" which Credit Bureau attempted to collect from Jeter arose out of the type of consumer transaction which the FDCPA covers. *See* 15 U.S.C.A. § 1692a(5) ("any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services, which are the subject of the transaction are primarily for personal, family, or household purposes ....").

**2.** Jeter maintains that discovery was improperly limited by the district court. *See infra* note 10.

rant, the unthinking, and the credulous," *Florence Mfg. Co. v. J.C. Dowd & Co.,* 2 Cir., 178 F. 73, 75 [ (1910) ]; and the "fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced." *Federal Trade Commission v. Standard Education Soc.,* 302 U.S. 112, 116 [58 S.Ct. 113, 115, 82 L.Ed. 141 (1937) ] ....

*Id.* at 679; *see also FTC v. Raladam Co.,* 316 U.S. 149, 151–52, 62 S.Ct. 966, 968–69, 86 L.Ed. 1336 (1942); *Exposition Press, Inc. v. FTC,* 295 F.2d 869 (2d Cir.1961), *cert. denied,* 370 U.S. 917, 82 S.Ct. 1554, 8 L.Ed.2d 497 (1962). The standard enunciated by *Charles of the Ritz, supra,* has been followed in an enormous number of federal court and FTC decisions, and controlling precedent in this circuit is in accord. *Gulf Oil Corp. v. FTC,* 150 F.2d 106 (5th Cir. 1945)[3] (adopting the above-quoted language from *Charles of the Ritz* ).

In 1967, the FTC issued regulations entitled "Guidelines Against Debt Collection Deception," 16 C.F.R. § 237.0–.6, which under the authority of § 5 of the FTC Act bans debt collection agencies from using "any deceptive representation or deceptive means to collect or attempt to collect debts or to obtain information concerning debtors." 16 C.F.R. § 237.1.[4] Unfair and deceptive debt practices have been the frequent subject of FTC enforcement action. *See State v. O'Neill Investigations, Inc.,* 609 P.2d 520, 529 n. 29 (Alaska 1980) (citing numerous cases). The FTC and the federal courts have consistently held that it is a deceptive practice to falsely represent that unpaid debts would be referred to a lawyer for immediate legal action. *E.g., Trans World Accounts v. FTC,* 594 F.2d 212, 215 (9th Cir.1979); *Dorfman v. FTC,* 144 F.2d

737 (8th Cir.1944); *State Credit Ass'n,* 86 FTC 502, 507, 510 (1975); *American Credit Bureau, Inc.,* 84 FTC 1582, 1584–85, 1590 (1974); *Hurst Corp.,* 82 FTC 218, 224 (1973); *Sunshine Art Studios, Inc.,* 81 FTC 836, 859–61 (1972); *Wilson Chemical Co.,* 64 FTC 168, 185 (1964). In these cases, consistent with the legal standard in other actions under § 5, the FTC has looked not to the "reasonable consumer," but to a less sophisticated consumer and whether the debt collection practice has a tendency or capacity to deceive. *See e.g., Wilson Chemical Co., supra,* 64 FTC at 185.

The above discussion indicates that, prior to the passage of the FDCPA, the FTC had protected unsophisticated consumers from debt collection practices which have a tendency or capacity to deceive. Credit Bureau argues that the FTC jurisprudence under § 5 is irrelevant to litigation under the FDCPA. Our review of the authorities leads us to precisely the opposite conclusion. In its "findings and declaration of purpose" incorporated in the FDCPA, Congress found that despite prior FTC enforcement in the area "[t]here is abundant evidence of abusive, deceptive and unfair debt collection practices by many debt collectors.... Existing laws and procedures for redressing these injuries are inadequate to protect consumers." 15 U.S.C.A. § 1692(a), (b). The legislative history echoes these purposes and concerns. S.Rep. No. 95–382, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Ad.News 1695, 1697 ("The committee believes that the serious and widespread abuses in this area and the inadequacy of existing State and Federal laws make this legislation necessary and appropriate"). It would be anomalous for the Congress, in light of its belief that existing state and federal law was inade-

---

**3.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

**4.** The FTC regulations specifically invoke agency power to prohibit the type of alleged misrep-

resentation at issue in this case. *See* 16 C.F.R. § 237.1 Note 6 ("The Commission has prohibited, *among others,* the following misrepresentations: ... 6. That debts have been turned over to an attorney or an independent organization engaged in the business of collecting past-due accounts").

quate to protect consumers, to have intended that the legal standard under the FDCPA be *less* protective of consumers than under the existing "inadequate" legislation.[5] We are not prepared to adopt such an anomalous interpretation of the FDCPA. As the Alaska Supreme Court aptly described the FDCPA's relationship to prior consumer protection legislation:

> The [FDCPA] *expands* already existing Federal Trade Commission jurisdiction over unfair or deceptive acts and practices of collection agencies; it is not written on a clean slate. The Federal Trade Commission's prior exercise of jurisdiction in this area is entitled to great weight, *U.S. v. Shreveport Grain & Elevator Co.,* 287 U.S. 77, 84, 53 S.Ct. 42, 44,

**5.** The FDCPA expanded on existing federal legislation and regulation in granting several specific rights including the right of the consumer to cut off agency contacts, and to insist upon detailed information concerning the amount of the debt. 15 U.S.C.A. §§ 1692c, 1692g. Most importantly, consumers were given a private right of action to enforce the provisions of the FDCPA against debt collectors, 15 U.S.C.A. § 1692k, a right which does not exist under the FTC Act. *See Holloway v. Bristol-Myers Corp.,* 485 F.2d 986 (D.C.Cir.1973) (no implied private right of action under FTC Act).

Although the FDCPA provides a private right of action, it also provides for administrative enforcement by the FTC. 15 U.S.C.A. § 1692*l*. The FDCPA further provides that "[f]or the purpose of the exercise by the Commission of its functions and powers under the Federal Trade Commission Act, a violation of this subchapter shall be deemed an unfair or deceptive act or practice in violation of that Act." *Id.* In treating all violations of the FDCPA as violations of the FTC Act for purposes of administrative enforcement, Congress implicitly incorporated FTC Act jurisprudence. Congress would not have at the same time intended to create two legal standards, one for private enforcement and one for agency enforcement, while enacting one set of substantive rights to protect consumers from unfair, deceptive or abusive debt collectors.

**6.** The *Wright* case rejected the holding of *Blackwell v. Professional Business Services,* 526 F.Supp. 535 (N.D.Ga.1981), which held that the court must look to "whether a reasonable consumer would be deceived or misled by particular language." *Id.* at 538; *see also, Zoeckler v. Credit Claims and Collection, Inc.,* No. C82–272A (N.D.Ga. Sept. 30, 1982). The *Wright* court adopted a "least sophisticated" consumer standard, but refused to ground its holding in a

77 L.Ed. 175, 179 (1932), and leads to the conclusion that the new Act merely supplements the [FTC Act] ....

*State v. O'Neill Investigations, Inc.,* 609 P.2d 520, 530 (emphasis in original).

In light of the purposes of the FDCPA, the general FTC jurisprudence under § 5, and the prior FTC enforcement in the debt collection area, we conclude that the district court erred in judging Credit Bureau's actions by reference to the "reasonable consumer." Our position is supported by a majority of the federal courts to address this question. *Baker v. G.C. Services Corp.,* 677 F.2d 775, 778 (9th Cir.1982); *Wright v. Credit Bureau of Georgia, Inc.,* 548 F.Supp. 591, 599 (N.D.Ga.1982), *reconsidered,* 555 F.Supp. 1005 (N.D.Ga.1983);[6]

rejection of the "reasonable consumer" standard:

> Thus, regardless of whether the standard is expressed by the term "reasonable consumer" or the term "debtors on the low side of reasonable capacity," the court must gauge the tendency of a debt collector's language to deceive by use of a standard that protects "the unsophisticated."

*Wright v. Credit Bureau of Georgia, Inc.,* 548 F.Supp. 591, 599–600 (N.D.Ga.1982). Upon reconsideration, the *Wright* court made the following statement:

> This court has not rejected out-of-hand the "reasonable consumer" standard. Instead, this court declined to follow the *Blackwell* court only to the extent that the *Blackwell* reasonable consumer standard may be applied in a manner that does not take into account that the recipients of a debt collector's letter include both unsophisticated and sophisticated consumers. This court considers the term "reasonable consumer" an appropriate appellation for the objective standard to be applied, so long as that standard encompasses protection for "the unsophisticated or uneducated consumer." *See Bustamante v. First Federal Savings & Loan Ass'n,* 619 F.2d 360, 364 (5th Cir.1980).

*Wright v. Credit Bureau of Georgia, Inc.,* 555 F.Supp. 1005, 1007 (N.D.Ga.1983).

We agree with the *Wright* court that the FDCPA was intended to protect "unsophisticated consumers," and we note its adoption of the standard enunciated in *Exposition Press,* the standard which we adopt here. See discussion in text *infra.* Nevertheless, we find the court's discussion of "reasonable consumer," especially in the court's second opinion, to be confusing. We find no need to decide whether the notion of "reasonable consumer" encompasses "unsophis-

*Bingham v. Collection Bureau, Inc.*, 505 F.Supp. 864, 870 (D.N.Dak.1981). All of the above-cited cases looked to the standard enunciated in *Exposition Press Inc. v. FTC*, 295 F.2d 869 (2d Cir.1961), an FTC enforcement action to enjoin allegedly deceptive advertising. In *Exposition Press*, the FTC had found that an advertisement used by a publisher in seeking writers' manuscripts for publication had deceived its readers with regard to the real value of a so-called "40% royalty." The Second Circuit affirmed the FTC's finding, and in so holding stated:

> In evaluating the tendency of language to deceive, the Commission should look not to the most sophisticated readers but rather to the least [citations omitted] .... For this reason, we must reject the argument that any reasonable author should have known enough not to expect a free-and-clear 40% royalty ....

*Id.* at 872.

Because we believe that Congress intended the standard under the FDCPA to be the same as that enunciated in the relevant FTC cases, *see supra* note 5, and because we believe that "[t]he FDCPA's purpose of protecting [consumers] ... is best served by a definition of 'deceive' that looks to the tendency of language to mislead the least sophisticated recipients of a debt collector's letters and telephone calls," *Wright v. Credit Bureau of Georgia, Inc.*, 548 F.Supp. at 599, we adopt the *Exposition Press* standard of "least sophisticated consumer" as previously followed by the federal courts in *Baker, supra* and *Bingham, supra.*

## III. FALSE OR MISLEADING REPRESENTATIONS?

Jeter claims that the letter sent by Credit Bureau violated 15 U.S.C.A. §§ 1692e(5) and (10). These subsections provide:

> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collec-

tion of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

> . . . .

> (5) The threat to take any action that cannot legally be taken or that is not intended to be taken.

> . . . . .

> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

Jeter has presented two theories for relief under subsection (5). First, Jeter claims that Credit Bureau's letters indicate that it would recommend legal action upon the expiration of the five-day period referred to in the letters or shortly thereafter and, as such, amounted to threats to take actions which were not intended to be taken. Second, Jeter claims that Credit Bureau *never* intended to recommend legal action. Jeter also maintains that the letters, individually and/or collectively, were deceptive within the meaning of subsection (10). We will discuss in turn Jeter's two theories for relief under subsection (5), and then her claim under subsection (10).

### A. *Claim Under Subsection (5)*

Subsection (5) of § 1692e does not require application of the legal standard developed in Part II, *supra*. The subsection (5) issue is simply whether or not Credit Bureau *intended* to take the action threatened. Thus, subsection (5) requires proof of a fact which amounts to a *per se* violation of § 1692e. The sophistication, or lack thereof, of the consumer is irrelevant to whether Credit Bureau "threat[ened] to take any action ... that [was] not intended to be taken."

First, we consider Jeter's claim that Credit Bureau falsely threatened to take legal action in the immediate or near future. It is undisputed in the record that

---

ticated consumers." To the extent that the standard set out in the *Wright* opinions is interpreted as inconsistent with the standard set out

today, that standard is hereby effectively modified.

Credit Bureau did not recommend legal action immediately upon the expiration of the five-day period after it sent the letters to Jeter or shortly thereafter. The district court's reliance on the fact that "[a]n officer of the defendant has stated that the defendant did, in fact, intend to recommend legal action," is not by any means dispositive with regard to whether Credit Bureau intended to recommend legal action upon the expiration of the five-day period. The party seeking summary judgment bears the burden of demonstrating that there is no genuine dispute as to any material fact, and all evidence and all reasonable factual inferences therefrom must be viewed in a light most favorable to the party opposing the motion. *Clemons v. Dougherty County*, 684 F.2d 1365, 1368 (11th Cir.1982). Although the parties agree on the basic facts in this case, they disagree upon the proper inferences to be drawn from the letters sent by Credit Bureau to Jeter. Such a disagreement, if reasonable, is one for resolution by the trier of fact, not by the court in a summary judgment context. *See Lighting Fixture and Electric Supply Co. v. Continental Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir.1969). If one reads the letters literally, the alleged debtor is simply required to make payment to Credit Bureau within five days, and if the alleged debt is not paid, Credit Bureau will recommend suit sometime thereafter. However, a reasonable jury [7] could read the letter as a threat to recommend legal action immediately upon the expiration of the five-day period or shortly thereafter. For instance, the first letter says that Credit Bureau would recommend legal action "unless satisfactory arrangements are made within five (5) days." The letter goes on to tell the alleged debtor to "[r]espond now and avoid the necessity of further action." A jury could have interpreted this language as indicative of a threat to recom-

mend legal action immediately upon expiration of the five-day period, if Jeter had not paid the alleged debt. Similarly, Credit Bureau's second letter to Jeter states that Credit Bureau will recommend legal action "if the entire balance is not in this office within the next five days." The letter goes on to tell Jeter to "[a]ttend to it now ...." [8] In short, the jury could reasonably have found that Credit Bureau's reference to a five-day period preceding the recommendation of a lawsuit against Jeter was indicative of a threat to recommend legal action immediately upon the expiration of the five-day period or shortly thereafter if the alleged debt was not paid.

Thus, the jury has two tasks. First, it must ascertain the meaning of Credit Bureau's letters to determine just what was threatened. As indicated above, a reasonable jury may find that the letters evidence a threat to recommend legal action immediately upon expiration of the five-day period or shortly thereafter. If the jury so finds, it must then decide whether Credit Bureau intended to take such threatened action in this case. In this regard, the jury may consider Credit Bureau's assertion that at the times the letters were sent Credit Bureau intended to recommend legal action. Of course, the jury will have to consider the contrary evidence that legal action was not recommended shortly after the expiration of the five-day periods, and, in fact, was *never* recommended at all.

We turn now to Jeter's second claim under subsection (5): whether Credit Bureau *ever* intended to recommend legal action in Jeter's case. Credit Bureau relies on the affidavit of its regional manager, Mel Center, which states the following three relevant facts:

(1) That at the time the letters were sent, Credit Bureau intended to recommend legal action against Jeter; (2) That

---

7. In *Sibley v. Fulton DeKalb Collection Service*, 677 F.2d 830 (11th Cir.1982), this court held that a plaintiff, upon timely demand, is entitled to a trial by jury in a claim for damages under the FDCPA.

8. These potential ambiguities in the letters sent by Credit Bureau to Jeter also form the basis of our conclusion that the grant of summary judgment in favor of Credit Bureau on Jeter's claim of deception under 15 U.S.C.A. § 1692e(10) was improper. *See infra* Part III.B.

Credit Bureau does recommend that clients take legal action to collect debts that Credit Bureau has been unable to collect; and (3) That Credit Bureau has recommended that Associated Consumers take legal action to collect debts that Credit Bureau has been unable to collect.

In addition, Credit Bureau's partial responses to Jeter's interrogatories indicate that it does take legal action in cases like Jeter's involving small debts. On the other hand, Jeter presents the deposition of Michael Rogers, president of Associated Consumers. He testified that:

(1) For the years 1981–83, Associated Consumers referred approximately 105–110 accounts to Credit Bureau for collection; (2) That Credit Bureau never recommended that Associated Consumers bring a lawsuit to collect a debt; (3) That Credit Bureau, not Associated Consumers, was the entity that brought legal action when it was deemed appropriate; (4) That Credit Bureau, not Associated Consumers, was the entity that made the determination as to whether legal action was appropriate; and (5) In 1983, Credit Bureau sued on approximately 15 Associated Consumers' accounts.

■ We conclude that there is a genuine issue of fact as to whether Credit Bureau ever intended to recommend legal action against Jeter. Credit Bureau's conclusory affidavit that there was such an intent is not dispositive, especially in light of the apparently small percentage of Associated Consumers' debts that did result in suit, and in light of the obvious conflict in the evidence as to which entity, Credit Bureau or Associated Consumers, was responsible for instituting lawsuits.[9] The issue should have been submitted to the jury.[10]

### B. *Claim Under Subsection (10)*

■ We turn now to Jeter's subsection (10) claim. Here, the legal consequences of Credit Bureau's failure to recommend legal action within five days does require the application of the legal standard enunciated in Part II, *supra.*

■ We conclude that the district court erred in granting summary judgment to Credit Bureau. As we have indicated in Part III.A., *supra,* a reasonable jury could well have interpreted Credit Bureau's letters as threatening to take legal action immediately upon expiration of the five-day periods or shortly thereafter, if the debtor had not yet paid the alleged debt. Under subsection (10), we must consider whether the "least sophisticated consumer" would be deceived by Credit Bureau's letters, *i.e.,* whether the letters were a "deceptive means" to collect alleged debts, valid or invalid, by the use of false or deliberately ambiguous threats to recommend legal action. It may be, although we doubt it, that a "reasonable consumer" would have taken Credit Bureau's letters as empty threats to recommend legal action at some undisclosed time in the distant future; however, the fact that Jeter hired a lawyer and responded to the second letter seems to support the opposite view.[11] In any event, we

---

**9.** There is also a reasonable inference that legal action would be recommended more rarely in small debt cases like Jeter's. Further discovery may well disclose that the fifteen suits filed in 1983 by Credit Bureau on behalf of Associated Consumers were all or primarily large debt cases. Discovery may also disclose a similar pattern generally in Credit Bureau's recommendations to institute suit. *See infra* note 10.

**10.** Jeter argues on appeal that the district court erred in limiting discovery. We note, however, that the district court dismissed as moot Jeter's motion to compel discovery after granting summary judgment for Credit Bureau. Since the district court did not rule on the merits of the discovery issue, we will not assume that the

district court needs guidance in fashioning an evenhanded method of providing discovery of documents which are apparently relevant to the issues to be decided.

**11.** The district court opinion stressed the fact that Jeter was not deceived because she hired a lawyer and successfully warded off the Credit Bureau. First, we reiterate that the question is not whether Jeter was deceived, but whether the "least sophisticated consumer" would have been deceived. Of course, the extent of Jeter's deception is relevant to damages under the FDCPA. *See* 15 U.S.C.A. §§ 1692k(a)(1), (2)(A). Second, on remand the evidence may well indicate that Jeter was deceived, her hiring of an attorney being a direct result of that deception. It is true

are confident that whether the "least sophisticated consumer" would construe Credit Bureau's letter as deceptive is a question for the jury. On remand, the jury should be instructed on the standard enunciated in Part II, *supra*, and allowed to determine whether, operating under that standard, Credit Bureau's letters were deceptive.

## IV. HARASSMENT OR ABUSE?

 Jeter argues that the district court erred in granting summary judgment in favor of Credit Bureau on her claim under § 1692d. Section 1692d reads as follows:

> A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> (1) The use or threat of use of violence or other criminal means to harm the physical person, reputation, or property of any person.
>
> (2) The use of obscene or profane language or language the natural consequence of which is to abuse the hearer or reader.
>
> (3) The publication of a list of consumers who allegedly refuse to pay debts, except to a consumer reporting agency or to persons meeting the requirements of section 1681a(f) or 1681b(3) of this title.
>
> (4) The advertisement for sale of any debt to coerce payment of the debt.
>
> (5) Causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number.

> (6) Except as provided in section 1692b of this title, the placement of telephone calls without meaningful disclosure of the caller's identity.

15 U.S.C.A. § 1692d. Subsections (1)–(6) do not proscribe Credit Bureau's conduct or the content of the two letters sent to Jeter. Focusing on subsection (2), Jeter claims that the letters involve "[t]he use of ... language the natural consequence of which is to abuse the ... reader." 15 U.S.C.A. § 1692d(2). However, it is clear that, when read in context, subsection (2) was meant to deter offensive language which is at least akin to profanity or obscenity. Such offensive language might encompass name-calling, racial or ethnic slurs, and other derogatory remarks which are similar in their offensiveness to obscene or profane remarks. This is in keeping with one of the purposes of the FDCPA "[t]hat every individual, whether or not he owes the debt, has a right to be treated in a reasonable or civil manner." 123 Cong.Rec. 10241 (1977) (statement of Representative Annuzio, Chairperson of Subcommittee which sponsored the legislation). The language of Credit Bureau's letters is not remotely offensive. The letters contained no personal comments directed towards Jeter. Thus, subsection (2) does not encompass Jeter's claim.

However, § 1692d is explicitly not limited to the conduct proscribed by subsections (1)–(6). "This will enable the courts, where appropriate, to proscribe other improper conduct which is not specifically addressed." S.Rep. No. 95–832, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Ad.News 1695, 1698. The district court decided, however, that it was inappropriate to characterize Credit Bureau's conduct as violative of § 1692d:

> The defendant in the present case merely threatened to institute legal action against the plaintiff. The sentence that the plaintiff objects to is the one

---

that Jeter might have been injured worse. Upon receiving one or both of the letters, she could have immediately paid the debt, thinking she was about to be sued. This case, therefore, may well illustrate one of the purposes behind

§§ 1692e(5) and (10). Congress apparently was aware that a false threat to sue in the near future might well be used to induce premature payment of an alleged debt with respect to which the consumer has a legitimate defense.

that stated that the institution of such proceedings could possibly cause her "embarrassment, inconvenience, and further expense." The Court feels that this language would not oppress or harass a reasonable consumer .... [T]he defendant in the case at bar merely pointed out to the plaintiff the potential problems she might face if a lawsuit was brought against her. These problems could possibly arise in the defense of any lawsuit. *See generally, Wright v. Credit Bureau of Georgia, Inc.,* 555 F.Supp. 1005 (N.D. Ga.1983) (letter containing general threat that debtor's credit rating would be adversely affected if he did not pay held not to violate the FDCPA). Therefore, the Court finds that a reasonable consumer would not have been harassed or oppressed by the defendant's letters and hence there was no violation of 15 U.S.C. § 1692(D) [sic].

We note that the district court applied a "reasonable consumer" standard to Jeter's claim under § 1692d, a standard which we have rejected with respect to claims of misrepresentation and deception under § 1692e. However, we cannot simply apply a "least sophisticated consumer" standard. Whether a consumer is more or less likely to be harassed, oppressed, or abused by certain debt collection practices does not relate solely to the consumer's relative sophistication; rather, such susceptibility might be affected by other circumstances of the consumer or by the relationship between the consumer and the debt collection agency. For example, a very intelligent and sophisticated consumer might well be susceptible to harassment, oppression, or abuse because he is poor (*i.e.*, has limited access to the legal system), is on probation, or is otherwise at the mercy of a power relationship. Although the standard enunciated in Part II, *supra*, is not precisely applicable here, we believe that the consumer protective purposes of the FDCPA require us to adopt an analogous standard for violations of § 1692d. Thus, we hold that claims under § 1692d should be viewed from the perspective of a consumer whose circumstances makes him relatively more susceptible to harassment, oppression, or abuse.

That a lawsuit might cause a consumer "embarrassment, inconvenience, and further expense" is a true statement. Such consequences of a debt collection (or any other) lawsuit are so commonplace that even a consumer susceptible to harassment, oppression, or abuse would not have been harassed, oppressed, or abused by the statement *in and of itself.* A simple warning of "embarrassment, inconvenience, and further expense" does not create a "tone ... of intimidation ...." *Rutyna v. Collection Accounts Terminal, Inc.,* 478 F.Supp. 980, 982 (N.D.Ill.1979). Of course, Credit Bureau's statement was part and parcel of general representations which a reasonable jury could find to be violative of §§ 1692e(5) and (10), *i.e.*, potentially deceptive or false use of threats to recommend legal action. *See supra* Part III. Deception or falsehood alone, however, is wholly different from the conduct condemned in subsections (1) through (6) of § 1692d. Thus, we believe that Congress did not contemplate the prohibition of deceptive conduct *per se* within the confines of § 1692d.

Ordinarily, whether conduct harasses, oppresses, or abuses will be a question for the jury. Nevertheless, Congress has indicated its desire for the courts to structure the confines of § 1692d. S.Rep. No. 95-832, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Ad. News 1695, 1698 (courts will proscribe "other improper conduct which is not specifically addressed"). The above discussion and a review of the case law, *see, e.g., Wright v. Credit Bureau of Georgia, Inc.,* 548 F.Supp. 591 (N.D.Ga.1982); *Harvey v. United Adjusters,* 509 F.Supp. 1218 (D.Ore.1981); *In re Scrimpsher,* 17 B.R. 999 (Bankr.N.D.N.Y.1982), lead us to the conclusion that, even when judged by the consumer protective standard we adopt today, § 1692d does not as a matter of law proscribe Credit Bureau's conduct in this

case.[12] Thus, the district court's grant of summary judgment in favor of Credit Bureau on this issue is affirmed.

## CONCLUSION

For the foregoing reasons, we affirm in part, reverse in part, and remand to the district court for proceedings not inconsistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.

---

**12.** Jeter cites the case of *Rutyna v. Collection Accounts Terminal, Inc.,* 478 F.Supp. 980 (N.D. Ill.1979), in support of her claim under § 1692d. In *Rutyna,* the plaintiff received a letter from the debt collector which stated that the debt collector's "field investigator has now been instructed to make an investigation in your neighborhood and to personally call on your employer." *Id.* at 981. The plaintiff quite reasonably became upset and worried that the debt collector's agent would begin informing her neighbors of her debt and related medical problems. *Ru-* *tyna* represents the type of coercion and delving into the personal lives of debtors that the FDCPA in general, and § 1692d in particular, was designed to address. *See id.* at 982; *see generally,* Tavormina, *The Fair Debt Collection Practices Act—The Consumer's Answer to Abusive Collection Practices,* 52 Tul.L.Rev. 584, 590–93 (1978) (describing certain provisions of the FDCPA as protecting the consumer's right to privacy). The facts here do not remotely resemble those in *Rutyna.*